Filed 12/31/24  P. v. Velarde CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JUAN VELARDE, Defendant and Appellant. | D082435 (Super. Ct. No. JCF005115) |


APPEAL from a judgment of the Superior Court of Imperial County, Poli Flores, Jr., Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Velarde appeals following his conviction on two counts of committing a lewd act upon a child. (Pen. Code, § 288, subd. (a).) He alleges there were two evidentiary errors of constitutional magnitude during his trial. First, he claims the court violated his Fourteenth Amendment right to due process by admitting into evidence the recording of a pretext phone call that the victim, Jane Doe,[1] made to him. Second, he asserts the court violated his Fifth and Sixth Amendment rights to due process, to confrontation, and to present a defense by limiting his counsel's ability to explore another allegation of sexual abuse involving other members of Jane's family. We see no error, constitutional or otherwise, and accordingly affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Velarde was married to Jane's paternal grandmother from 2014 until 2018, when Jane was between 6 and 10 years old. During this time, Jane and her brother visited the home that their grandmother shared with Velarde on a regular basis. Jane visited the home alone sometimes as well.

Beginning when Jane was six years old, Velarde kissed her whenever they were alone, and sometimes put his tongue in her mouth. Jane also claimed that Velarde put his hands on her buttocks when they hugged and "peek[ed]" at her in the shower. This continued until her grandmother and Velarde separated and she stopped visiting their home, when she was 10 years old.

In June 2021, Jane confided in her brother that Velarde was "handsy" with her, kissed her, and intentionally walked in on her showering. With her

---

[1] To protect the privacy of the victim and her family, we anonymize her by referring to her as Jane Doe (Jane).

brother's encouragement, Jane told their parents about the sexual abuse one or two weeks later.  She told her mother first, then her father.  Her father contacted the police right away.

The prosecution charged Velarde with three counts of committing a lewd act upon a child.  (Pen. Code, § 288, subd. (a).)  It was specifically alleged that he "kissed the victim inappropriately" (counts 1 and 2) and "touched the victim's buttocks inappropriately" (count 3).

At trial, after the defense rested, the court granted Velarde's motion to dismiss count 3 based on insufficient evidence of intent.  (See Pen. Code, § 1118.1.)  A jury then convicted him on counts 1 and 2.  The court sentenced him to two concurrent terms of three years (the low term) on those counts.

## DISCUSSION

A.    The pretext call between Velarde and Jane was properly admitted.

Velarde contends the trial court violated his Fourteenth Amendment right to due process by admitting a pretext phone call into evidence.  He claims that any statements he made during the call were involuntary because Jane "used emotional pressure to coerce him to make admissions."  We discern no coercion under the totality of the circumstances here.

### 1.    Additional Background

After Jane's father reported the abuse to the police, Detective Daniel Schleyer was assigned to the case.  As part of his investigation, the detective arranged a pretext call between Jane and Velarde.  As Detective Schleyer explained, pretext calls are phone calls from the victim to the suspect usually in an officer's presence.  Their main purpose is to elicit admissions and explanations from the suspect.  To prepare Jane for the call, Schleyer provided her with "a theme"—"why you did this to me"—but not a list of questions.  She was encouraged to ask questions in her own words.  If Jane

3

got "stuck" during the call, Schleyer would guide her back to the theme or write down a suggested response.

The recorded call was played for the jury at trial. When Velarde answered the phone, Jane immediately asked him, "Why did you do these things to me?" He asked what he did, and she told him not to "act so clueless." She asserted that he kissed her on the lips, looked at her in the shower, and slept beside her. He replied, "What are you talking about?" She explained that "[i]t bothers [her] now"—she was having trouble sleeping, struggling in school, and feeling ill. Velarde asked if Jane's grandmother put her up to this.

Jane insisted that he kissed her "any chance [he] got" and "tried to put [his] tongue with [hers]." Velarde repeated that he could not remember that. He did remember, however, that they were close and sometimes she would "come over and kiss [him] and . . . stuff like that." But he never thought about it "in a bad way."

Velarde said he was "surprised" she was "telling him all this stuff" because he loved her and considered her his grandchild. He again asked if her grandmother or aunt told her "all this stuff." Jane responded, "[S]o you . . . thought it was okay to kiss your own granddaughter on the lips. Why did you do that?" Velarde maintained that he did not do that, or did not remember doing that. But if he did, he was "so sorry" and "probably did it unintentionally" because they were always playing and kidding around. This became a refrain throughout the rest of the call.

He adamantly denied peeking at her in the shower. He remembered one time he helped her turn the shower on, but she was covered at the time. He also denied ever sleeping next to her; he only ever checked on her to see whether she was still sleeping.

4

About one week after the call, Detective Schleyer asked Velarde to come to the police station for an interview. Velarde said that he wanted to speak with an attorney, then ultimately declined the interview. The prosecution filed its complaint against Velarde two months later. He was arrested soon after that.

Before trial, Velarde moved to exclude the pretext call on two grounds. First, he claimed that his Fifth Amendment right against self-incrimination was violated because he was not given *Miranda* warnings at the outset of the call. (See *Miranda v. Arizona* (1966) 384 U.S. 436.) Second, he argued that the government violated his Sixth Amendment right to counsel because Jane, acting as an agent of the police, elicited incriminating statements from him outside the presence of counsel. (See *Massiah v. United States* (1964) 377 U.S. 201.) The prosecution opposed, asserting there was no constitutional error. At the time of the call, Velarde was not in custody, so *Miranda* warnings were unnecessary, and the prosecution had not yet filed charges against him, so the right to counsel had not yet attached.

After hearing testimony from Detective Schleyer and argument from counsel, the trial court admitted the call into evidence. It agreed with the prosecution that there was no Fifth or Sixth Amendment violation.

### 2. Forfeiture

On appeal, Velarde does not renew his claims of *Miranda* and *Massiah* error. Although the first issue in his opening brief is titled "admission of the pretext call violated Appellant's Fifth and Sixth Amendment rights" (some capitalization omitted), he does not substantively develop those claims. He does not dispute the trial court's finding that he was not in custody at the time of the pretext call. (See generally *People v. Mickey* (1991) 54 Cal.3d 612, 648 ["Absent 'custodial interrogation,' *Miranda* simply does not come into

5

play"].)  Nor does Velarde assert that criminal proceedings had begun by that point, triggering his Sixth Amendment right to counsel.  (See generally *People v. Fayed* (2020) 9 Cal.5th 147, 161 ["The 'clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him' "].)

Taking a different tack on appeal, Velarde contends the pretext call was inadmissible as a matter of due process because the statements he made during the call were emotionally coerced.  We question whether this argument was preserved for appeal, since it was not clearly articulated below.[2]  (See *People v. Williams* (2010) 49 Cal.4th 405, 435 (*Williams*) ["A defendant ordinarily forfeits elements of a voluntariness claim that were not raised below"].)  In any event, even assuming it was preserved, we reject it on the merits because there was no denial of due process here.

### 3.    The Call Did Not Include Any Coerced Admissions

"It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion."  (*People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).)  "[C]oercive *police activity* is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  (*Colorado v. Connelly* (1986) 479 U.S. 157, 167, italics added.)  Even "[t]he most outrageous behavior by a *private party* seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."  (*Id.* at p. 166, italics added.)

---

[2]    The Attorney General does not assert forfeiture in his brief.

"A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*).) "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " (*Ibid.*) Voluntariness is evaluated under the totality of the circumstances. (*Williams*, *supra*, 49 Cal.4th at p. 436.) Relevant factors include " ' "the crucial element of police coercion; the length of the interrogation; its location; its continuity" as well as "the defendant's maturity; education; physical condition; and mental health." ' " (*Ibid.*, citations omitted.)

On appeal, we examine the uncontradicted facts surrounding the statements and independently determine whether the statements " ' "were voluntarily given without previous inducement, intimidation or threat." ' " (*Maury*, *supra*, 30 Cal.4th at p. 404.) To the extent there is conflicting evidence, we must accept the version of events that is most favorable to the prosecution, provided it is supported by the record. (*Ibid.*)

Velarde theorizes that the pretext call was effectively a police interview because Jane was acting as an agent of, or at the behest of, the police. For this proposition Velarde cites *Maine v. Moulton* (1985) 474 U.S. 159, *In re Wilson* (1992) 3 Cal.4th 945, and *Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*), but those cases are distinguishable. In *Moulton*, the police agent was a codefendant who agreed to record incriminating conversations with the defendant. In exchange, the state agreed that no further charges would be brought against him. (*Moulton*, at pp. 162–164, 176–177.) The incriminating statements in *Wilson* were elicited by an undercover district attorney's investigator as well as the defendant's cellmate who was cooperating with the state in hopes of receiving favorable treatment in his own case. (*In re Wilson*, at pp. 952–953; *People v. Wilson* (1992) 3 Cal.4th

7

926, 933–934 [facts set forth in companion case].)  And *Fulminante* involved a paid confidential informant.  (*Fulminante*, at pp. 283, 288.)  None of these cases involve a victim participating in the investigation of their own case.

Even assuming that Jane was acting as an agent of the police, the record does not show that Velarde's will was overborne.  On this point, he mainly argues that his statements "were involuntary because [Jane] used emotional pressure to coerce him to make admissions."  To be sure, it is undisputed that Jane was upset and crying during the call.  But Velarde offers no authority suggesting that speaking to an emotional child over the phone rises to the level of psychological coercion that offends the due process clause.  (See *Williams*, *supra*, 49 Cal.4th at p. 443 [" ' "courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary *and unreliable*" ' " (italics added)]; see generally *People v. Smith* (2007) 40 Cal.4th 483, 505–506 [collecting cases where courts have deemed "intimidating and deceptive" interrogation tactics proper].)

Velarde again references *Fulminante*, *supra*, 499 U.S. 279.  In that case, the defendant was incarcerated for an unrelated crime but was suspected of murdering a child.  (*Id*. at p. 282.)  A fellow inmate—a paid confidential informant who "masqueraded as an organized crime figure"— told the defendant that he knew the defendant was " 'starting to get some tough treatment' " from other inmates due to rumors about the murder.  (*Id*. at p. 283.)  When he offered to protect the defendant if he told him about the crime, the defendant confessed.  (*Ibid*.)  "Although the question [was] a close one," the high court concluded the confession was coerced given the "credible threat of physical violence" that the defendant faced.  (*Id*. at pp. 287–288.) *Fulminante* was a close case, and this case lacks comparable elements of

coercion. Velarde was neither incarcerated nor facing any threat of physical harm. He was free to end the phone call at any time. Jane did not threaten Velarde or promise him anything in exchange for a confession.

Velarde also points out that he "had no criminal record and thus no experience with law enforcement." This factor, while true, is not relevant here because the pretext call was with Jane, not police. Velarde was unaware that Detective Schleyer was listening to or recording the call.

More importantly, Velarde did not clearly admit anything during the call. When Jane accused him of kissing her inappropriately, he repeatedly claimed that he did not remember doing so. But if he did kiss her, he posited, it was unintentional because they were always kidding around. He denied peeking at her in the shower or sleeping beside her, offering instead benign scenarios that might have confused her. And he repeatedly questioned whether Jane's grandmother or aunt influenced her to call. Velarde's responses, "far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58; see also *Williams*, *supra*, 49 Cal.4th at p. 444–445 ["it is evident that defendant's will was not overborne . . . because he continued to deny any involvement in the crime"].)

Arguably the most incriminating statements from Velarde during the call were his conditional apologies. For instance, he told Jane, "I am so – so – so sorry if I did it. Like I said, I must have not done it intentionally and only because it was like we were always kidding around." At trial, however, Velarde testified that he only apologized to calm Jane down. He explained that he has a degree in psychology and worked with adolescents as a substance abuse counselor for more than 10 years. He was trained on how

9

"to deal with minors that are agitated and in a high state of anxiety." One approach is to say something to the effect of, "I'm sorry you feel this way, but if you want to talk about it, you know, I'm willing to hear you." This testimony—confirming that Velarde could and did exercise rational thought when speaking to an upset child—further undermines his claim of coercion.

Under the totality of the circumstances presented here, we conclude that the pretext call did not include any coerced admissions. Accordingly, there was no due process violation in admitting the call into evidence.

B.    Evidence of alleged abuse of Jane's brother by a different family member was properly limited.

Velarde also contends the trial court violated his Fifth and Sixth Amendment rights to due process, to confrontation, and to present a defense by limiting evidence that Jane's father had once accused his own father (Jane's biological grandfather) of sexually abusing his son (Jane's brother).

### 1.    Additional Background

During cross-examination of Jane's father, defense counsel asked whether he had "ever claim[ed]" that his own father (Jane's biological grandfather) had molested his son (Jane's brother). The father answered, "We did a police report on that." When counsel began to clarify, the prosecutor objected on relevance grounds.

Outside the jury's presence, counsel argued that the testimony was relevant because it showed "a propensity for this family to bring accusations of child sexual molest" against the grandmother's ex-husbands. In turn, counsel suggested the evidence might show that Jane "was coached into" accusing Velarde of sexual abuse. Counsel insisted this line of inquiry was an exercise of Velarde's Sixth Amendment right to confront and cross-examine his accusers. The prosecutor maintained that the testimony was more prejudicial than probative. She "fail[ed] to see the relevance" of

10

evidence that "a separate child made an accusation of being molested by a separate individual" and believed it would "taint the jury . . . against the credibility of the witnesses here."

The trial court excluded the testimony under Evidence Code section 352. It found the probative value of the evidence to be minimal since it involved the family generally instead of Jane or Velarde specifically, and it was unclear why the grandmother's first marriage ended. The court also perceived "a strong chance" the testimony "would create a mini trial within a trial" which would confuse the jurors and cause an undue consumption of time. As the court explained, the testimony the defense was attempting to elicit would effectively put the biological grandfather on trial, causing the jurors to question and evaluate the circumstances of the accusation against him, whether that accusation was credible, and how it compared to this case. But here, the jury needed to focus on whether Velarde committed the charged offenses, which largely turned on the credibility of Jane and Velarde.

Defense counsel filed a motion for reconsideration, which was heard the following morning. To buttress his argument, counsel explained that he had spoken with Dr. Thomas Streed, a retired detective with a doctorate degree in human behavior, whom the defense intended to call as an expert on child sexual abuse investigations. According to counsel, Dr. Streed indicated that "it would be highly relevant to any investigator's work to find out whether other members of a family had also claimed that they were molested when they were children" because it "would be so rare to have two separate victims within the same family who both were molested by ex-family members of that family." Such information would be relevant in determining whether the child had been "exposed to discussions regarding that subject matter" or

11

"given any type of suggestions as to what to say . . . in terms of the reporting of the incident" to the police.

The trial court was unpersuaded. In its view, the evidence was only potentially relevant if the accusation against the biological grandfather was false (which would perhaps allow the jury to infer that the accusation against Velarde was also false). But to establish whether the accusation against the biological grandfather was false would require a mini trial within a trial. The court emphasized that "we don't know the full context of the previous case," whether Jane's father "was instrumental in" that accusation, or whether the accusation was false. Even assuming it was false, the court reiterated that the probative value of Jane's father accusing his own father of abusing his son was slight, since it had nothing to do with Jane or Velarde.

Nevertheless, the court permitted counsel to question Detective Schleyer, in general terms, on whether he asked the family during the investigation whether anyone else in the family had been sexually abused, and to question Dr. Streed on the significance of that inquiry. The court also allowed counsel to ask Jane whether she was aware of an allegation that her brother had been sexually abused.

### 2. Limiting the Evidence Was Not A Constitutional Violation

Only relevant evidence—evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210)—is admissible at trial. (*Id.*, § 350.) Even if relevant, the court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of

misleading the jury." (*Id.*, § 352.)  We review Evidence Code section 352 decisions for abuse of discretion.  (*People v. Lee* (2011) 51 Cal.4th 620, 643.)

"As a general matter, the ordinary rules of evidence"—including Evidence Code section 352—"do not impermissibly infringe on the accused's right to present a defense."  (*People v. Hall* (1986) 41 Cal.3d 826, 834.)  "Although *completely* excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*), italics added.)

"Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.'  In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352.  A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624, citations omitted.)

Here, we see no abuse of discretion or constitutional violation.  The trial court permitted defense counsel to substantially develop the evidence concerning the allegation involving the biological grandfather and brother. On cross-examination, Jane's father confirmed that the family filed a police report regarding the allegation.  Defense counsel then asked Detective Schleyer whether the family had disclosed this prior complaint to him during his investigation, and the detective said no.  In turn, counsel elicited

testimony from the defense expert, Dr. Streed, that if he were the investigator in this case, he would have wanted to know whether the family made other reports of child sexual abuse to determine whether Jane was influenced to make the allegations at issue. A social worker who interviewed Jane also agreed with counsel that it is important to understand whether anybody else in the family had ever claimed to be sexually abused in conducting a forensic interview in these cases. From this evidence, counsel was able to argue two principal defense theories in closing: that it was the "modus operandi" of the family to "target" the grandmother's ex-husbands with false accusations of child sexual abuse, and that the investigation in this case was subpar.

The court only precluded defense counsel from exploring the *details* of the other allegation. It fairly determined that the risk of confusing the issues and unduly consuming time substantially outweighed the probative value of delving into the details, since the allegation did not involve Jane or Velarde.

Importantly, Velarde fails to explain how additional evidence regarding the prior allegation would have changed the outcome in this case. (See *Fudge*, *supra*, 7 Cal.4th at p. 1103 [where " 'there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense' . . . the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836"].) Indeed, as the Attorney General points out, the defense failed to make an offer of proof as to what additional evidence it would have elicited if given the opportunity. Without this information, it is not possible to meaningfully evaluate the prejudice, if any, resulting from the limitation. (See *People v. Anderson* (2001) 25 Cal.4th 543, 580 ["the reviewing court must know the substance of the excluded evidence in order to assess prejudice"].)

Even assuming the defense offered to establish that Jane's father, in fact, falsely accused his own father of sexual abuse, this would seem to cast little doubt on the veracity of Jane's allegations against Velarde, in light of her testimony that she disclosed the abuse separately to her brother, then to her mother, and lastly to her father, and that she was not aware of her brother's abuse until "[w]ay after" she disclosed her own abuse to her parents. In other words, without evidence that Jane's father was the first person she discussed the abuse with, or that she was even aware of the prior accusation against her grandfather, the details of the prior allegation would hardly support the theory that Jane's father "coached" her into accusing Velarde.

In sum, because we detect no abuse of discretion or constitutional error, and Velarde otherwise fails to show prejudice, there is no reason to reverse.

## DISPOSITION

The judgment is affirmed.

DATO, Acting P. J.

WE CONCUR:

DO, J.

RUBIN, J.

15